Hall *v.* Hall.

VIRGINIA CARY SMITH HALL

*v.*

THOMAS H. HALL.

[Filed February 23d, 1900.]

1. That a husband is overbearing and unkind does not constitute such cruelty as to be of itself a cause of divorce or to convert the wife's leaving him into desertion by him.

2. A husband whose overbearing and unkind treatment has caused his wife to desert him is not entitled to divorce on the ground of desertion where he has not made advances and concessions at a time and in a manner suitable to obtaining her return.

On petition and cross-petition.

*Mr. Alexander C. Young*, for the petitioner.

*Mr. George G. Tennant*, for the defendant.

STEVENS, V. C.

The petitioner and defendant were married on June 29th, 1894. Mrs. Hall was then about twenty-four years old and the defendant was, I suppose, about the same age. They lived together in Jersey City until February 13th, 1896, when the wife left her husband's home. There is a petition and cross-petition. The wife says the defendant constructively deserted her because his extreme cruelty compelled her to leave. The husband denies the cruelty and says the petitioner left him without cause. The evidence taken as a whole shows, I think, that the husband was often overbearing and unkind. It falls short of establishing such cruelty as would of itself be a cause of divorce and as would therefore convert the wife's leaving into the husband's desertion.

The wife's petition should be dismissed.

Hall *v.* Hall.

A more difficult question arises on the husband's cross-petition. It has been well settled by decisions both in this court and in the court of appeals, that although a wife leaves her husband willfully, her desertion does not become *obstinate* unless persisted in against effort or influence on his part to bring it to an end. It is his duty to make such advances or concessions as a just man would make with a view to terminate it. This is the language of the leading case of *Bowlby* v. *Bowlby, 10 C. E. Gr. 406 (affirmed, 10 C. E. Gr. 570)*, a case which, as it seems to me, expresses more accurately than any other the true meaning of the word "*obstinate.*" In *Van Wart* v. *Van Wart, 12 Dick. Ch. Rep. 598*, where all the cases are cited, I used the following language: "In considering what effort or concession must be made in any given case, the conduct of the parties towards each other must be considered. It is obvious that more effort and concession will be required of one whose conduct actually produces or contributes to produce the desertion than of one who is blameless. If the party deserted is not in fault and effort to induce the deserting party to return would probably prove unavailing, it need not be shown. *Trall* v. *Trall, 5 Stew. Eq. 231.* In general it may be said that that desertion is to be adjudged obstinate which has resisted such effort or concession as the party alleging desertion ought, under the particular circumstances of the case, to have made to bring it to an end." I shall test the cross-petition by this rule.

The petitioner is the daughter of A. Cary Smith, a naval architect. The defendant is a ribbon manufacturer. The petitioner was of a nervous disposition ; subject to fainting fits, both before and after her marriage, and often hysterical. In the summer of 1895 she began to suffer from ulceration of the uterus, accompanied with left lateral displacement, the effect, as she says, of a cold contracted. In November of that year she went to a specialist for treatment. She did not recover until September of the year following, or about six months after the alleged desertion took place. It seems to be clear that, in the language of the witness Calvin Smith, the parties were not suited to each other. There was constant bickering, caused,

Hall *v.* Hall.

according to the husband, by the ill temper of the wife, and, according to the wife, by the harsh, overbearing conduct of the husband. Each accuses the other of profanity. It is quite certain that on some occasions the husband swore at her. I have little doubt that he, by his unkindness and want of sympathy, often made her unhappy. Because of her nervous condition, trifles were at times magnified by her, and there was, no doubt, mutual fault. When, in the fall of 1895, she was suffering from the disease of which I have spoken, marital intercourse between the parties should have ceased. It is admitted that it did not. The wife says it caused her pain, and her testimony in this regard is corroborated by the medical witnesses. She further says that her husband knew that it pained her, and that she did not desire it. The husband says that she did not object to it, and even solicited it. The undisputed fact is, however, that during this period (November to February) she became very unhappy, told her husband she no longer loved him, and talked about a separation. On the Sunday before she left, according to the decided weight of evidence, he, without provocation, in the presence of a guest, at the dinner table, raised a carving fork, swore at her, and in an angry tone said, " I have a good mind to throw this at you." She left him on February 13th, while he was at his place of business, without having informed him that she was going, and her father and mother assisted her in her preparations for departure. Her mother says that when she was brought to her father's house in Bayonne she was perfectly wild and didn't know where she was, but that after some time with kind treatment and care she recovered. On defendant's return home from work the servant handed him the following note from her father :

"*Mr. Thomas Hall :*

"DEAR SIR—I have been obliged to take my daughter home on account of your cruel and unmanly treatment of her. While you may not regard it as such, the effect has been so marked, that after due consideration and advice, I have been obliged to take this step. My lawyers, Cary & Whitridge, 59 Wall street, N. Y. City, will receive any communication that you may desire to make."

Hall *v.* Hall.

We now come to the point of the case. What did the defendant do? Did he make those advances or concessions, to bring about his wife's return, which a just man ought to have made under the circumstances?

The first thing he did was just what he might have been expected to do. On the day following her departure he went to his father-in-law's house. He did not see his wife, but he did see his mother-in-law. She treated him courteously and said, so he testifies, " something about her husband and herself feeling very badly about it,"

" and I [he says] immediately suggested that I also felt badly about it, and I asked her if she realized how I must have felt when I came home that night. She said that she felt very sorry for me."

He testifies further :

" Her manner throughout was almost cordial ; * * * nor did it show any repulsion for me. I was really surprised at the treatment I received. I was surprised that she should be so pleasant to me in view of the letter her husband had written me."

He says that in the course of the interview she stated that she would try to make an appointment for him. On the day after he called, Mr. Smith addressed him, under date of February 18th, as follows :

" Dear Sir—Referring to your visit to my house yesterday, would say that I deem it better for both parties that you should not call there again, but address all communication to Cary & Whitridge, 59 Wall street, N. Y. City."

On February 21st the defendant wrote as follows to his wife :

" Jersey City, N. J., February 21st, 1896.

" Dear Virginia—As you are aware, I called at your father's house to see you, last Monday. Yesterday I read your father's letter of the 18th inst., which had been delayed in the mail, and noted his suggestion that I should not call again. As I do not wish to create any disturbance, I take this means of saying what I came to say in person, not forgetting my right and duty towards you as your husband :

" Rumors are or have been current since your unwarranted desertion of me and the home I provided for you, apparently emanating either from you or some member of your family, that reflect seriously on me in my relation with

Hall *v.* Hall.

you. No one knows better than you the falsity and absurdity of such reports, and for that reason I am loath to believe that you are responsible for this, but my information seems to show that you are the author of them. In view of all this I demand, as your husband—knowing that I have always done my full duty towards you and that no one can honestly attach any blame to me—that you cease your scandalous conduct and immediately resume your proper and lawful relation with me.

"However hard you and I may feel just at present, I think it is our duty to remember that we are man and wife, and we should endeavor to heal all differences. It is not too late to accomplish this. I am willing to forgive. Will you do the same?

"As I am not living in the Bergen avenue house now, will you please address me at the office, stating when you will meet me at the house, and I will be prepared to receive you.

"Sincerely your husband,

"Tom."

"P. S.—It has just occurred to me that possibly you are not acting of your own free will in the matter. Any suggestion from you that you have been coerced into this matter will be pleasing news to me, for I will then take the necessary steps to enable you to come back."

The defendant says that the rumors alluded to in the above letter related to his marital intercourse with his wife. This letter is neither an advance nor a concession. He takes the ground that *he* has been wholly in the right and *she* wholly in the wrong. His language is, "I *demand*, as your husband— knowing that I have always done my full duty to you— * * * that you immediately resume your proper and lawful relation with me." The tenor of it is not warranted by the evidence.

Very shortly after this the defendant went to Mr. Tennant, more, he says, as a friend than as a lawyer. Mr. Tennant went to see Mr. Smith, who courteously received him. Mr. Tennant called Mr. Smith's attention to the words "cruel and unmanly treatment," contained in his letter of February 13th, and asked him what he referred to. He says he did not succeed in getting any information. He asked Mr. Smith if an appointment could not be arranged between Mr. and Mrs. Hall, and the reply was that it would go hard with Mr. Hall if he went to Mr. Smith's house. Mr. Smith admits on cross-examination that he likewise said that when he brought his daughter home that was final.

Hall v. Hall.

The tone adopted by Mr. Tennant in this interview corresponds exactly with the tone of the defendant's letter. He assumes that his client is the injured party. He does not bear a message expressing regret for the defendant's past misconduct, nor does he give any assurance of kinder treatment in the future. He asks for an explanation.

On March 9th Mr. Tennant writes to Mr. Smith, informing him that his daughter has a topaz brooch, an heirloom of the Hall family, given to Mrs. Hall as a present, and he adds, "as it has been in the Hall family so long, and as young Mrs. Hall appears to care nothing for the family connection, I suppose she will not care to retain it." In this letter he offers to repay Mr. Smith some money advanced to pay the specialist who had been treating his daughter. To this letter Mr. Smith replies that he would, on a receipt given, place the brooch in Mr. Tennant's hands, and that he waived all claim to have the money repaid.

This ends the correspondence. Mr. Hall never afterwards wrote to his wife. He never afterwards sent her any message or token of remembrance, although he knew she was sick, and when he afterwards, on two or three occasions, actually met her on the ferryboat, he neither recognized her nor spoke to her.

Now, I take it that the rule established by the cases referred to is not a technical rule. The advances or concessions which the husband must, as a just man, make, are real advances and real concessions. They must be made at a time and in a manner suitable to the attainment of their object, namely, reconciliation. If the demand for the wife's return be an angry demand, accompanied by no expression of regret for his own ill-doing— made, too, at a time when it is more likely to embitter than to conciliate—so far from being an advance or concession, it has rather the semblance of a continuation of the very conduct which brought about the desertion complained of.

I have found, as the result of the evidence, that the defendant was overbearing, unkind and sometimes profane. He seems to have been dominated by a supreme regard for self. This feeling crops out in every part of his narrative. He says he was almost heartbroken when his wife left him, but I think his

Hall *v.* Hall.

predominant feelings were anger and wounded self-love.   If he
was as much in love with his wife as he now pretends, I can
hardly conceive it possible that he would not have made a more
continuous and better-directed effort to accomplish her return.
On cross-examination he is asked the question, "Didn't you feel
that it was your duty to go to her and solicit her return after
her recovery from her illness?" and his reply is, "No, sir; she
knew that she could come back at any time; my house was kept
open *for two years* [he apparently has in mind the statutory
period] after that."

It is said on behalf of the defendant, and this is the strongest
ground he has to go upon, that any effort he might have made
would have been unavailing; that his wife had ceased to care
for him, and that his father-in-law, being greatly prejudiced
against him, would have opposed a re-union.   This argument
does not overcome the difficulty with defendant's case.   The law
imposes upon him the duty of making a *proper* effort.   If his
father-in-law had become prejudiced against him, it was only
because he was convinced that his daughter had been ill-used.
The prejudice *might* have been overcome by proper representa-
tion on his part.   He could hardly be said to have taken the
proper means to overcome it, when at so inopportune a time he
sent Mr. Tennant to ask an unnecessary explanation, and when
this was followed up by a request to return the brooch on the
ground that "young Mrs. Hall appeared to care nothing for the
family connection."   And if his wife had, during an illness
which, if it did not necessitate a temporary separation, at all
events made it very desirable, told him she did not love him, it
does not appear necessarily to follow that he might not, espe-
cially after her health had been restored, by a little kind atten-
tion and promise of amendment on his part, have induced her
to come back.   They had been married but a short time, and
nothing had occurred to render the breach past mending.   It is
quite probable that in any proper effort he might have had the
aid of his wife's mother.   The law does not assume that in every
case advance or concession *will* effect their end, but, as it *may*,
it is incumbent on the husband to make it.

Lane v. Calvary Church of Summit.

The defendant also relies upon rumor as an excuse for not making further effort. He was told, he says, that his wife had received an amatory letter from one Scofield, but the weight of the evidence is that she did not receive such a letter. The defendant says further that reports were current that Mrs. Hall, whenever she alluded to him, spoke as if she was going to get a divorce; but he never investigated these reports, and he must have heard of them after he had himself made up his mind to break with her. Her feeling was, in any event, the product of his conduct. If that had changed, her feeling toward him might have changed.

I am therefore of opinion that both petition and cross-petition should be dismissed.